IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

**FILED**

**Jun 16, 2021**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

KRISTOPHER DESHAWN SPEIGHT,

        Petitioner,

        vs.

KEN CLARK, Warden, California State
Prison-Corcoran,[1]

        Respondent.

No. 2:15-cv-00209-JKS

MEMORANDUM DECISION

Kristopher Speight, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Speight is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at California State Prison-Corcoran.  Respondent has answered, and Speight has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On August 2, 2010, Speight, along with co-defendant Orlindo Myles, was charged with residential burglary (Count I), robbery (Count II), assault with intent to commit rape during a burglary (Count III), sexual penetration with a foreign object (Count IV), and sexual penetration by foreign object in concert (Count V).  The information also alleged that the crimes in Counts IV and V were committed during the commission of a burglary and by tying or binding.  Speight pleaded not guilty and denied the enhancing allegations, and proceeded with Myles to a joint jury trial before separate juries.  On direct appeal of his conviction, the California Court of

---

[1]    Ken Clark is substituted for Dave Davey as Warden, California State Prison-Corcoran.  FED. R. CIV. P. 25(d).

Appeals recounted the following facts underlying the charges against Speight and the evidence

presented at trial:

> On June 8, 2005, the 14–year–old victim was at home alone with her two-year-old sister when Myles and Speight entered the home.[FN1]  The victim said Myles wore a red sweatshirt and Speight wore a blue sweatshirt.

> FN1.   All dates refer to 2005 unless otherwise indicated.

> Speight grabbed the victim's arm and placed his arm around her neck, putting her in a headlock.  Myles later also grabbed the victim, holding her tightly around her torso. While holding her, Myles groped the victim's breasts and tried to put his hands down her pants.  The victim yanked Myles's hand away and tried to grab his wrists to free herself from his hold.  Myles grabbed the victim's wrists and pushed her toward her parents' bedroom where Speight had gone.

> The victim's sister was asleep on her parents' bed.  The victim told defendants not to touch her sister.  Myles responded, "As long as you cooperate, we wouldn't do anything [to her]."  Speight was in the room when Myles made this threat "loud enough to hear" and Speight repeated almost the same statement made by Myles.  Speight then rummaged through the things in the parents' bedroom.

> Myles brought the victim to a bedroom across the hall. He took a digital camera and gave it to Speight, who placed it in a backpack and then left the bedroom.

> Myles kissed the victim, lifted her shirt, and sucked on her nipples.  He held the victim's hands above her head and tried to take off her pants and underwear.  The victim resisted, biting Myles on his right forearm and kicking him in the groin.  Myles punched the victim in the face and the top of her head three times with a closed fist, causing her nose to bleed.

> Myles then took the victim to her brothers' bedroom.  Speight was not in that room.  Myles threw the victim onto the bottom bunk of the bunk bed in the room.  He took his penis out of his pants and told the victim to suck it.  The victim refused.  Myles then ripped off the victim's bra, pulled down her pants and underwear, grabbed, kissed and sucked her breasts, tried to force himself on top of her and, using his hands, forced her to open her legs.  The victim resisted and tried to get Myles off her.  Her pants and underwear were around her ankles.

> At some point in time, Speight appeared at the doorway of the bedroom, looked inside and said "Come on.  We gotta go.  Her brothers are going to be home soon." Speight did not do or say anything to stop Myles from harming the victim.

> Myles picked the victim up and took her into the hallway.  The victim struggled to get out of his hold.  Her pants and underwear were around her ankles.  Speight was also in the hallway, in a position where he could see the victim struggling against Myles. Myles threatened to hit the victim with a wooden CD (compact disc) rack as the victim continued to struggle.

2

Myles told Speight to get something to tie the victim up with.  Speight left the hallway and returned with a cord in his hands.  The victim began to fight harder when she saw the cord, but she fell to the floor and ended up on her stomach.  Both defendants were on top of her tying her down.  The victim could not see which person actually tied her up.  Her hands were tied very tightly behind her back so that she could not move her hands.

After she was tied up, Myles pulled the victim to her feet.  He put his fingers inside the victim's vagina and said, "Tell me it feels good."  Speight was not in the hallway at that point.  The victim was unable to stop Myles because her hands were bound, and she felt completely helpless.

After he digitally penetrated her, Myles brought the victim, still tied up, back to her parents' bedroom.  The victim's sister was still asleep.  Speight took the victim's Playstation 2 console from her parents' bedroom.  He told Myles, "Leave her alone.  We gotta go."

The victim managed to dial 911 after defendants left.  The entire occurrence, from the time defendants entered the victim's home to the time they left, took about 10 to 15 minutes.

That same day, child abuse evidence collector Ana Ross saw bruises on the victim's nose, dried blood under her nose, redness on her neck and arms, and ligature marks on her wrists.  Ross also observed redness on the victim's hymen, which Ross testified was consistent with a sexual assault.

In Myles's backpack, police found a camera taken from the victim's house.  Myles also had what appeared to be a puncture mark on his right forearm.  In DNA testing of a saliva swab taken from the victim's left breast, Myles was determined to be a contributor.

Speight was eliminated as a contributor for the DNA sample taken from the victim's breast.  But Speight resembled the composite sketch of one of the intruders that was prepared based on the victim's description.

Police detectives interviewed Speight three times.  Speight lied to police about his whereabouts on June 8 during the first two interviews.  On June 14, police detectives interviewed Speight a third time.  Speight told detectives that Myles came up with the idea to "hit" the victim's house but Speight agreed to go with Myles; Myles tricked the victim into letting defendants into her house; Myles hit the victim; and Myles directed Speight to take various items from the house.  Speight also said he saw the victim's pants pulled down, heard Myles say "I'm about to fuck her," and realized that Myles was probably trying to rape the victim.  According to Speight, he objected and told Myles to leave the victim alone.  But Speight admitted that Myles instructed him to tie the victim up and Speight complied by wrapping a cord around her arms.  Speight did not tell police that he escorted the victim out of the room after Myles announced his intent to rape her.

At two live lineups on June 18, the victim identified Speight and Myles as her assailants.  The victim was certain that Myles was the person who sexually assaulted her.

A second amended information charged defendants with first degree residential burglary (Pen. Code, § 459—count one);[FN2] first degree robbery (§ 211—count two); assault with intent to commit rape, oral copulation, sexual penetration, or sexual

3

penetration in concert (§ 220, subd. (b)—count three); sexual penetration (§ 289, subd. (a)(1)—count four); and sexual penetration in concert (§ 264.1—count five).  It was alleged in counts four and five that defendants committed the charged sexual offenses during a first degree burglary and that defendants tied or bound the victim in the commission of the sexual offenses (§ 667.61, former subd. (e)(6), now subd. (e)(5)).

FN2.   Undesignated statutory references are to the Penal Code.

Defendants were tried together but with two juries.  Speight testified at trial. Myles did not testify.

Speight provided the following account about what happened on June 8: Myles asked Speight whether he knew of any houses to "hit" for a portable video game called "PSP."  Speight showed Myles the victim's house.  Although he was initially reluctant, Speight agreed to help Myles burglarize the house.

Speight rang the doorbell of the house to check whether anyone was at home.  He was surprised when the victim answered the door.  But Speight did not tell Myles that he did not want to go forward with their plan to burglarize the house.

Myles told Speight to find out whether anyone else was at home.  Speight complied when Myles said he would go with Speight.  They returned to the house together.  Speight asked the victim if her parents were home.  She responded that they were at work.  Speight and Myles then left.

Myles told Speight they were going to "rush" into the house, grab the victim, and "hit" the house.  Speight refused, but Myles convinced him to go back once more. Speight and Myles returned to the victim's house and rang the doorbell again.  They asked the victim to call them if she saw Speight's brother because they needed him to go home.  The victim invited Speight and Myles into the house.

The victim was writing down a fake telephone number that Speight gave her when Myles yelled "Grab her."  The victim hit Speight on the side of the head.  Speight grabbed the victim's arms to stop her from hitting him and Myles hit the victim.  Myles grabbed the victim and placed his arm around her neck.

When Speight saw Myles hit the victim, he "froze."  He did not expect that Myles would hit the victim, but he wanted "to go along with it and just get it done" so that they could leave the house.  Speight was afraid because, even though Myles never threatened him, he thought Myles might try to hit him.

Pursuant to instruction from Myles, Speight took a camera that was on the kitchen counter.  Speight proceeded to the first bedroom he saw, the parents' bedroom, and looked around for the PSP.  He then went across the hall to the next bedroom, thinking the PSP would more likely be in a kid's bedroom.

In the second bedroom, Speight saw Myles, with his back to Speight, leaning over the victim "like he was on top of her."  Speight saw the victim's shirt pulled up and her breasts were visible.

Speight told Myles he did not think the PSP was in the parents' bedroom.  Myles asked the victim if there were any guns or money in the house.  The victim answered no.

4

Myles then picked the victim up and said he was going to a back room.  The victim struggled with Myles.

Speight looked around the second bedroom for the PSP but did not find it.  He returned to the parents' bedroom, where he looked around for money and other things.  The telephone rang and Speight noticed the victim's sister on the bed.  Speight denied threatening to hurt the victim's sister and denied hearing Myles threaten to hurt her.  Speight panicked when he saw the victim's sister and went to search for Myles in the back bedrooms.

Standing at the doorway of one of the back bedrooms, Speight saw the victim sitting on a bunk bed with her pants around her legs and Myles kneeling in front of her.  Myles said he was about to "fuck her."  After Speight learned that Myles intended to rape the victim, Speight tried to get out of the house as fast as he could; he told Myles to leave the victim alone and they needed to leave the house.  Speight entered the bedroom, grabbed the victim by the shoulders and pants and pulled her up while trying to pull up her pants.  He pulled her into the hallway.

Myles stopped Speight and said they needed something to tie up the victim so she did not call the police.  Speight grabbed an electrical cord.  The victim struggled with Myles and Myles hit her in the stomach, causing her to fall to the ground.  The victim continued to fight and Myles threatened to hit her with a CD rack.  Speight instructed the victim to stop struggling.  He gave the cord to Myles and Myles used it to bind the victim. Speight denied that he tied up the victim.

After the victim was bound, Speight returned to the parents' bedroom.  He told Myles to bring the victim to the parents' bedroom and to put the victim on the bed.  Myles took a camera and asked Speight to take a Playstation 2 console.  Speight and Myles ran from the victim's house together.

Speight was not truthful with police when they interviewed him, and he tried to downplay his role in the incident.

*People v. Myles*, Nos. C066505, C066506, 2013 WL 4613810, at *2-5 (Cal. Ct. App. Aug. 29, 2013).

At the conclusion of trial, Speight's jury acquitted him of Count III but found him guilty of the other charges.[2]  The jury also found true all of strike allegations in Counts IV and V.  The trial court subsequently sentenced Speight to an aggregate term of 3 years plus 25 years to life imprisonment, calculated as follows: six years' imprisonment on Count II; a consecutive one

---

[2]     Myles' jury found him guilty on all counts and found true all but one strike allegation.

year and four months on Count I; a consecutive indeterminate term of 25 years to life

imprisonment on Count IV; a concurrent indeterminate term of life with the possibility of parole

on Count III; and an indeterminate term of 25 years to life imprisonment on Count V, stayed

pursuant to California Penal Code § 654.[3]

Through counsel, Speight appealed his conviction, arguing that: 1) the prosecution

introduced insufficient evidence to sustain his conviction in Count V for sexual penetration in

concert as an aider and abettor; 2) his jury was incorrectly instructed as to Count V's aiding and

abetting liability for acting in concert; 3) sexual penetration is a lesser necessarily-included

offense to sexual penetration in concert, and therefore the conviction in Count IV must be

stricken if Count V is allowed to stand; 4) the trial court erroneously instructed the jury that

Speight's testimony required corroboration; 5) the trial court gave an argumentative instruction

on aiding and abetting; 6) the trial court erred in failing to instruct *sua sponte* on the lesser

included offenses of battery and sexual battery in connection with the charge of sexual

penetration; 7) because Speight did not commit a sexual offense, the one strike finding that he

committed a sexual offense during the commission of a burglary is not supported by the

evidence; 8) the trial court erroneously believed consecutive sentences were mandatory; 9) the

sentence of 25 years to life imprisonment constitutes cruel and unusual punishment; 10) trial

counsel rendered ineffective assistance; and 11) the abstract of judgment must be corrected to

---

[3]     Section 654 provides in relevant part that "[a]n act or omission that is punishable
in different ways by different provisions of law shall be punished under the provision that
provides for the longest potential term of imprisonment, but in no case shall the act or omission
be punished under more than one provision."  CAL. PENAL CODE § 654.

reflect that Speight was convicted on Count V of sexual penetration in concert, not rape in concert.

The Court of Appeal agreed that sexual penetration (Count IV) was a lesser included offense of sexual penetration in concert (Count V). *Myles*, 2013 WL 4613810, at *10-11. It therefore dismissed the conviction on Count IV, lifted the stay of execution on Count V, and remanded for re-sentencing on that count.[4] *Id.* at *24. The appellate court unanimously affirmed the judgment in all other respects. *Id.* Speight petitioned for review in the California Supreme Court, which was denied without comment on December 18, 2013. His conviction became final on direct review 90 days later, when his time to file a petition for certiorari in the U.S. Supreme Court expired on March 18, 2014. *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

Speight timely filed the instant *pro se* Petition for a Writ of Habeas Corpus in this Court on January 20, 2015.[5] Docket No. 1 ("Petition"); *see* 28 U.S.C. § 2244(d)(1),(2). Briefing on this case is now complete, and the matter is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

In his *pro se* Petition before this Court, Speight argues that: 1) the trial court erred by instructing the jury that Speight's testimony required corroboration; 2) the trial court gave an

---

[4]    Speight was re-sentenced on June 27, 2014. The Superior Court dismissed the jury verdict as to Count IV for sexual penetration and vacated the previously-imposed sentence of 25 years to life imprisonment for that conviction. The court then lifted the stay of execution of sentence on Speight's Count V conviction for sexual penetration in concert and sentenced him to an indeterminate term of 25 years to life imprisonment on that count.

[5]    This Court, through a different magistrate and district judge, dismissed the habeas petition of Myles in Case No. 2:15-cv-00591-TLN-GGH. *See Myles v. Montgomery*, No. 2:15-cv-00591, 2020 WL 134362 (E.D. Cal. Jan. 13, 2020).

argumentative instruction on aiding and abetting; 3) the trial court erred in instructing the jury as to aiding and abetting liability for acting in concert; 4) the prosecution presented insufficient evidence to sustain his conviction for sexual penetration in concert; 5) the prosecution presented insufficient evidence to support the one-strike findings of tying and binding; 6) his sentence of 25 years to life imprisonment constitutes cruel and unusual punishment for a juvenile offender who was prosecuted for the sexual offense as an aider and abettor; and 7) trial counsel rendered ineffective assistance.

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  The term unreasonable is a common term in the legal world.  The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The

more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412. The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002). Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied). It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)). A summary denial is an adjudication

on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under

the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner

rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v.*

*Cockrell*, 537 U.S. 322, 340 (2003).

Speight has not replied to Respondent's answer.  The relevant statute provides that "[t]he

allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a

habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the

judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v.*

*Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence

offered to contradict the allegations of the return, the court must accept those allegations as true.

*See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.      Instructional Errors (Grounds 1-3)

Speight first argues that the trial court made a number of reversible errors with respect to

its instructions to the jury.  Because jury instructions in state trial are typically matters of state

law, federal courts are bound by a state appellate court's determination that a jury instruction

was not warranted under state law.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (noting that

the Supreme Court has repeatedly held that "a state court's interpretation of state law, including

one announced on direct appeal of the challenged conviction, binds a federal court sitting in

habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An

instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas

proceeding."  *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

10

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*. Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates the law. *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

1.      *CALCRIM No. 301*

Speight contends that the trial court erroneously instructed the jury that his testimony

required corroboration.  The record reflects that the trial court instructed the jury pursuant to

CALCRIM No. 301 as follows: "Except for the testimony of Defendant Kristopher Speight,

which requires supporting evidence, the testimony of only one witness can prove any fact.

Before you conclude that the testimony of one witness proves a fact, you should carefully review

the evidence."  The trial court gave this instruction at the defendants' joint trial, to which defense

counsel did not object, in the context of explaining accomplice testimony, which, under

California law, requires corroboration to support a criminal conviction.  CAL. PENAL CODE

§ 1111.  The bench notes to the CALCRIM No. 301 advise that a court should give the bracketed

phrase "if you decide (he/she) is an accomplice."  The trial court here, however, did not give that

phrase.

According to Speight, because he testified in his own defense and was not called by the

People, and the instructions as given did not differentiate between Speight's testimony as an

accomplice and that given in his case-in-chief, the court's instruction improperly shifted the

burden of proof because the instruction as given required that the testimonial evidence presented

in his case-in-chief had to be corroborated.  Speight further argues that the error was

compounded because the trial court also instructed the jury that it could convict Speight based

12

solely on the victim's uncorroborated testimony.[6]  Speight avers that these instructions

undermined his constitutional right to testify and to present evidence in his defense.

When considering this claim on direct appeal, the Court of Appeal found no error

because "the trial court did not instruct Speight's jury that [he] was an accomplice whose

testimony must be viewed with caution or distrust; rather, it instructed the jury that if any of the

charged crimes were committed, Myles was an accomplice to those crimes, and any statement by

Myles that tended to incriminate Speight should be viewed with caution."[7]  *Myles*, 2013 WL

4613810, at *11.  It further concluded that, even if it was error to instruct the jury pursuant to

CALCRIM No. 301, "the error was harmless beyond a reasonable doubt because the evidence

overwhelmingly established Speight's guilt on count five, sexual penetration in concert."  *Id.*

Although the challenged instruction certainly gives this Court pause,[8] it is not clear that

the instruction "by itself so infected the entire trial that the resulting conviction violates due

process," *Estelle*, 502 U.S. at 72, particularly given that the trial court also gave the full burden

of proof instruction under CALCRIM No. 220.  Nor can it be said that clearly-established

authority of the U.S. Supreme Court requires that jury instructions treat testimony of defendants

---

[6]       The trial court also instructed the jury with CALCRIM No. 1190, stating that
"[c]onviction of a sexual assault crime may be based on the testimony of a complaining witness
alone," which the Court of Appeal upheld as a "correct statement of law."  *Myles*, 2013 WL
4613810 at *11 n.7.

[7]       The record reflects that the trial court instructed the jury pursuant to CALCRIM
No. 335, which informed the jury that, if they believed the crimes had been committed, Myles
was an accomplice whose testimony should be viewed with caution.

[8]       Notably, the Court of Appeal's opinion states that Respondent did not dispute the
error on direct appeal.  *Myles*, 2013 WL 4613810, at *11.  On federal habeas review, however,
the Court must consider simply whether a state court's decision is reasonable, not whether it was
correct.  *Williams*, 529 U.S. at 411.

no differently than that of other witnesses, or exempts from California's accomplice testimony rule criminal defendants alleged to be accomplices.[9]

But in any event, a claim of jury instruction error is likewise reviewed under a harmless error standard on federal habeas review. *Evanchyk v. Stewart*, 340 F.3d 933, 940-41 (9th Cir. 2003). Habeas relief is only available where the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008). The relevant question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Elofus*, 598 F.3d 1171, 1174 (9th Cir. 2010). A federal court sitting in habeas review must independently "apply the *Brecht* test without regard for the state court's harmlessness determination." *Dixon v. Williams*, 750 F.3d 1027, 1035 (9th Cir. 2014) (citations omitted).

---

[9]     The Bench Note to CALCRIM No. 301 states, "The cautionary admonition regarding a single witness's testimony applies with equal force to uncorroborated testimony by a defendant." Speight argued in his petition for review on direct appeal that this statement "gives the erroneous impression that when a defendant testifies on his own behalf, and he is the accomplice of another co-defendant, his testimony is subject to cautionary aspects of the instruction, including the bracketed instruction requiring 'supporting evidence.'"

On independent review, the Court must conclude that the Court of Appeal's harmless error determination is both reasonable and supported by the record.[10]  As the Court of Appeal determined:

> Among other things, the trial court directed the jury to impartially compare and consider all the evidence, and it instructed them that unless the evidence proved Speight guilty beyond a reasonable doubt, the jury must find Speight not guilty.  We presume the jurors understood and followed the trial court's instructions.  (*People v. Holt* (1997) 15 Cal.4th 619, 662.)
>
> The victim testified to the following: two males entered her house and grabbed her; Myles hit her and sexually assaulted her but she fought him off; Myles told Speight to find something with which to tie the victim; Speight found a cord to use; the victim was rendered helpless after her hands were bound; Speight left her in the hallway with Myles after she was bound; and Myles then digitally penetrated her vagina.
>
> Speight's testimony corroborated the victim's testimony.  Speight testified that he and Myles, acting together, gained entry to the victim's house by trickery with a plan to steal a PSP; Myles hit the victim multiple times; in one of the bedrooms, Myles was on top of the victim and the victim's shirt was pulled up, revealing her breasts; in another bedroom, the victim was on the bed with her pants around her legs and Myles knelt in front of the victim; Myles said he was about to "fuck her"; the victim fought Myles; Myles asked for something to use with which to tie the victim; Speight gave Myles an electrical cord to use; and after the victim was bound, Speight left her in the hallway with Myles.  Speight acknowledged that binding the victim rendered her helpless against Myles's subsequent sexual assault.
>
> The victim's testimony about the sexual assault was also corroborated by DNA evidence, the puncture mark observed on Myles's forearm on June 14, and the testimony of Ana Ross regarding the victim's injuries.  The victim's testimony was also corroborated by the victim's statements to Ross on June 8 that there were two assailants, one of the assailants penetrated the victim's vagina with his finger, and both assailants threatened to hurt the victim's sister.

---

[10]     Other courts have admonished that harmless error review should not be confused with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).  *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. 2015) ("Time and time again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a review for whether there was sufficient evidence at trial to support a verdict.").  The Court's reliance on the overwhelming evidence against Speight in finding any error harmless does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors," including the overall strength of the prosecution's case.  *Id.* at 904 (citations omitted).

In addition, Speight's pretrial statement to police corroborated the evidence that Speight acted in concert with Myles and aided and abetted Myles in the commission of sexual penetration. The trial court instructed the jury that if it decided that a witness made a statement before trial, the jury could use the statement to evaluate whether the witness's testimony in court was believable and as evidence that the information in the earlier statement was true. The trial court also instructed the jury that it must decide how much importance to give pretrial statements and to consider such statements along with all the other evidence in reaching its verdict.

Speight told police that defendants entered the victim's house together to steal a game; they grabbed the victim; Myles hit the victim; Myles took the victim's pants off; Myles told Speight, "I'm about to fuck her" or "I'm about to rape this bitch" and the victim responded "no" or "don't"; Speight knew Myles was trying to rape the victim; thereafter Speight got a cord and wrapped it around the victim's arms when they were in the hallway; and Speight and Myles ran from the victim's house together.

Although Speight denied at trial that he tied the victim, he repeatedly told police that he did. The jury found that Speight engaged in the tying or binding of the victim.

The evidence overwhelmingly established Speight's guilt on count five, sexual penetration in concert. Based on the entire record, we conclude beyond a reasonable doubt that any error in instructing the jury pursuant to CALCRIM No. 301 did not contribute to the jury's findings on count five.

*Myles*, 2013 WL 4613810, at *11-12.

An independent review of the record reflects that the appellate court's harmlessness determination does not contravene or unreasonably apply Federal law. Speight is therefore not entitled to relief on this ground in any event.

2.    *Aiding and Abetting Factors*

Speight additionally contends that the trial court gave an argumentative instruction on aiding and abetting. The record reflects that the trial court gave the following special instruction to the jury over Speight's objection: "Among the factors which may be considered in making the determination of aiding and abetting are: presence at the scene of the crime, companionship, flight, and conduct before and after the offense." Speight claims that the special instruction was argumentative and invited the jury to draw inferences favorable to the prosecution. He says that the instruction implied that the cited factors were to be accorded weight, thereby violating his

16

federal due process right to have the jury decide the issue of guilt or innocence.  The Court of Appeal rejected the argument on direct appeal, concluding that "the instruction merely listed factors which the jury could consider."  *Myles*, 2013 WL 4613810, at *13.

Because the Court of Appeal held that this instruction was a correct statement of California law on aiding and abetting, this Court is bound by the state court's interpretation of state law.  *See Bradshaw*, 546 U.S. at 76.  Speight also fails to establish that the challenged instruction was impermissibly argumentative or otherwise deprived him of a fair trial.  With respect to Speight's culpability, the main issue at trial was whether Speight aided and abetted Myles in the commission of sexual assault.  The challenged special instruction simply instructed the jury how to determine that issue.  Importantly, the instruction did not direct, or event suggest, that Speight aided and abetted Myles; rather, it provided the jury factors that it may consider in determining that issue under the appropriate state law.

In addition, the trial court instructed the jury that it was tasked with deciding what the facts were and that it was not to assume that, because the court issued a particular instruction, that it was making any suggestions about the facts of the case.  The trial court also properly instructed the jury regarding the elements of the crimes charged, and the prosecution's burden to prove each element beyond a reasonable doubt.  The Court presumes the jury followed those instructions.  *Weeks*, 528 U.S. at 234.  Accordingly, based on an independent review of the record and the instructions as a whole, the Court cannot find unreasonable or contrary to Federal law the state courts' rejection of this instructional error claim.

17

3.      *"In Concert" Requirements*

Speight, challenging his conviction on Count V of sexual penetration in concert, next avers that the trial court erred in instructing the jury on the meaning of the words "in concert." He contends that CALCRIM No. 1046 describes "acting 'in concert'" in terms of "aiding and abetting" and does not adequately convey the requirement that the co-defendants must act together in a concerted effort.  According to Speight, the trial court's answers to jury questions on the subject reinforced the error.  He claims the instructional error permitted the jury to convict him without proof that he acted in a concerted effort with Myles to commit the crime of sexual penetration.

On direct appeal, the Court of Appeal upheld CALCRIM No. 1046 as a correct statement of California law, finding "no reasonable likelihood the jury understood that it could convict Speight of sexual penetration in concert without finding concerted action by Speight and Myles and conduct by Speight which aided Myles in committing the crime of sexual penetration." *Myles*, 2013 WL 4613810, at *10.  In arguing that the Court of Appeal's conclusion unreasonably applied Federal law, Speight points to no specific authority of the U.S. Supreme Court.  Again, "evaluating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Yarborough*, 541 U.S. at 664.  Given this leeway and the deference this Court must afford the state court decision, the Court cannot find unreasonable or contrary to Federal law the Court of Appeal's determination that there was no reasonable probability that the challenged instruction would have misled the jury in the manner Speight now suggests.  Accordingly, Speight is not entitled to relief on this claim either.

B.    <u>Sufficiency of the Evidence</u> (Grounds 4, 5)

Speight additionally argues that the prosecution presented legally insufficient evidence to sustain his conviction for sexual penetration in concert as an aider and abettor as well as the one strike finding that he committed a sexual offense during the commission of a burglary.  As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This Court must therefore determine whether the California courts unreasonably applied *Jackson*.  In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial.  *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution."  *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).  Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law.  *Jackson*, 443 U.S. at 324 n.16.  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the

challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law.  When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . .").  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction.  *Schlup v. Delo*, 513 U.S. 298, 330 (1995).  The United States Supreme Court has even further limited a federal court's scope of review under *Jackson*, holding that "a reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam).  *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id*.  Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

1.     *Count 5*

Speight first challenges his conviction on Count V, sexual penetration in concert as an aider and abettor.  According to Speight, there is no evidence that he knew of Myles's intent to

commit sexual penetration, and no evidence that Speight intended to encourage or facilitate the

commission of that offense.  He points to contrary evidence that "[t]he victim testified that

[Speight] urged [Myles] to leave the premises before the sexual offense was committed and told

[Myles] to leave her alone after the offense was committed."  The Court of Appeal considered

and rejected this claim on direct appeal as follows:

> Section 264.1 provides in pertinent part that "in any case in which the defendant, voluntarily acting in concert with another person, by force or violence and against the will of the victim," commits the offense of sexual penetration, as described in section 289 [defining sexual penetration], either personally or as an aider and abettor, the defendant shall be sentenced to state prison. (§ 264.1, subd. (a).)
>
> A defendant is guilty of sexual penetration in concert as an aider and abettor if (1) the direct perpetrator committed or attempted to commit the offense of sexual penetration, (2) the aider and abettor knew of the direct perpetrator's unlawful intent, (3) the aider and abettor intended to encourage and bring about the direct perpetrator's unlawful ends, and (4) the aider and abettor engaged in conduct that in fact assisted the achievement of the crime.  (*People v. Perez* (2005) 35 Cal.4th 1219, 1225–1227; *People v. Keovilayphone* (2005) 132 Cal.App.4th 491, 497.)
>
> Whether a defendant aided and abetted the commission of a crime is a question of fact which may be proved by circumstantial evidence.  (*People v. Beeman* (1984) 35 Cal.3d 547, 559–560; *People v. Pitts* (1990) 223 Cal. App. 3d 606, 892–893.)  A number of cases have discussed the evidence sufficient to support such a conviction.  (*See, e.g.*, *People v. Pelayo* (1999) 69 Cal. App. 4th 115, 120–121 [sufficient evidence where defendant facilitated the sexual penetration committed by cohort]; *People v. Nguyen* (1993) 21 Cal. App. 4th 518, 529–530, 533–534 [defendants aided and abetted the perpetrators who actually committed the sexual offense]; *People v. Lopez* (1981) 116 Cal. App. 3d 882, 884–885 [sufficient evidence where defendant's actions prior to rape showed he knew cohort's intent to rape and he helped cohort carry out plan]; *People v. Villa* (1957) 156 Cal. App. 2d 128, 130–132, 135–137 [sufficient evidence where defendant's silence and lack of objection constituted tacit approval of sexual offense]; *People v. Shevette* (1950) 98 Cal. App. 2d 782, 783–786 [sufficient evidence where defendant aided and abetted cohort].)
>
> Here, the record establishes there was sufficient evidence from which the jury could reasonably find that Speight committed sexual penetration in concert as an aider and abettor.  Acting together, Myles and Speight entered the victim's home and grabbed her.  Myles groped the victim's breasts and attempted to put his hands down her pants the first time he grabbed her.  To gain the victim's cooperation, defendants threatened to harm the victim's sister.  Thereafter, Speight saw Myles on top of the victim in one of the bedrooms and saw that the victim's shirt was pulled up.  Speight did not object to

Myles's treatment of the victim but instead continued to carry out their plan to search the victim's house for the PSP, leaving Myles alone with the victim.

In one of the back bedrooms, Speight saw the victim with her pants pulled down around her legs and Myles kneeling in front of her. Myles told Speight he was about to "fuck her." Speight knew at that point that Myles intended to rape the victim. According to the victim, Speight did not pull Myles off her, did not object to what Myles said he intended to do, and did not tell Myles to leave her alone. Instead, when Myles announced that he wanted to bind the victim, Speight gave Myles an electrical cord to use for that purpose and, according to the victim, helped restrain and bind the victim. The victim's testimony that Speight helped bind her is consistent with Speight's pretrial admission to police that he wrapped a cord around the victim's arms. After the victim's hands were bound, Myles digitally penetrated her vagina.

Although Speight was not in the hallway when Myles committed the offense of sexual penetration, the jury could reasonably conclude that Speight knew Myles intended to rape the victim, Speight's conduct evinced an intent to help Myles accomplish his stated purpose, and Speight's actions in fact helped Myles commit sexual penetration. (*People v. Pelayo*, *supra*, 69 Cal. App. 4th at p. 121 [presence when the crime occurred is not required for aider and abettor liability]; *People v. Nguyen*, *supra*, 21 Cal. App. 4th at pp. 529–530 [failure to take action to prevent a crime is a factor the jury may consider in assessing defendant's criminal responsibility], 531–532 [a person may aid and abet a criminal offense without prior agreement, and the primary offender need not expressly communicate his criminal purpose to defendant because that purpose may be apparent from the circumstances].)

Speight testified that he tried to stop Myles from raping the victim. He also testified that his reasons for helping Myles bind the victim did not include assisting Myles with sexual assault. But the jury was not required to believe Speight's testimony in that regard, and it clearly did not believe it. (*People v. Beeman*, *supra*, 35 Cal.3d at pp. 559–560; *People v. Villa*, *supra*, 156 Cal. App. 2d at p. 136.)

Substantial evidence supports the jury's finding that all of the elements of sexual penetration in concert as an aider and abettor were established.

*Myles*, 2013 WL 4613810 at *7-8.

The Court of Appeal's application of the *Jackson* standard was not objectively

unreasonable. For the reasons thoughtfully and persuasively presented by the Court of Appeal, a

rational juror, when viewing the evidence in the light most favorable to the prosecution and

resolving all conflicts in the evidence in favor of the jury's verdict, could have determined

beyond a reasonable doubt that Speight's actions evinced the requisite intent to encourage and

facilitate Myles' crime, and demonstrated that Speight in fact assisted Myles in his commission

of the crime.  While it may have been possible for the jury to come to another conclusion, all of the evidence in support of his claim was before the jury for its assessment.  This Court is precluded from re-weighing the evidence or re-assessing witness credibility.  *Schlup*, 513 U.S at 330; *Bruce v. Terhune*, 376 F.3d 950, 957-58 (9th Cir. 2004).  Speight is thus not entitled to relief on this claim.

      2.    *Special Punishment*

Speight additionally argues that, because he did not personally commit any sexual offense, the one strike finding that he committed a sexual offense during the commission of a burglary is not supported by the evidence.  According to Speight, Section 667.61(e)(2) applies only to those who personally commit an enumerated sexual offense and not to aiders and abettors.  Speight therefore argues that the jury's finding, made pursuant to Section 667.61(e)(2) that he committed the crimes of sexual penetration and sexual penetration in concert during the commission of a burglary, was erroneous.  The Court of Appeal rejected that claim on direct appeal, concluding that "Section 667.61(e)(2) does not say that it only applies when a defendant personally commits a sexual offense," and that even if the statutory language were ambiguous, "legislative intent supports the application of section 667.61(e)(2) to aiders and abettors." *Myles*, 2013 WL 4613810, at \*15-16.

Speight fares no better on federal habeas review.  The essence of Speight's claim is that the Court of Appeal erred in its interpretation of Penal Code § 667.61(e)(2).  But again, federal courts are "bound by a state court's construction of its own penal statutes," *Aponte v. Gomez*, 993 F.2d 705, 707 (9th Cir. 1993), and this Court therefore must defer to the California courts' application of its law unless that interpretation is "untenable or amounts to a subterfuge to avoid

federal habeas review of a constitutional violation," *Oxborrow v. Eikenberry*, 877 F.2d 1395,

1399 (9th Cir. 1989); *see also Bradshaw*, 546 U.S. at 76 (noting that the Supreme Court has

repeatedly held that "a state court's interpretation of state law, including one announced on

direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.").

Speight fails to show that the appellate court's interpretation is untenable, or otherwise

unreasonable or contrary to Federal law.  Speight is therefore not entitled to relief on this legal

insufficiency claim either.

C.      Cruel and Unusual Punishment (Ground 6)

        Speight next contends, as he did on direct appeal, that his aggregate 28-year-to-life

sentence constitutes cruel and unusual punishment under the Eighth Amendment.  In support of

this claim, Speight stresses that, at the time of the crimes, he was 17 years old and had no prior

offenses.  The Eighth Amendment, applicable to the States through the Fourteenth Amendment,

proscribes the infliction of "cruel and unusual punishments."  U.S. CONST. amend. VIII; *Kennedy

v. Louisiana*, 554 U.S. 407, 419 (2008).  The Supreme Court has held that "the only relevant

clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework

is the gross disproportionality principle, the precise contours of which are unclear, applicable

only in the 'exceedingly rare' and 'extreme' case." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)

(citation omitted).  In determining whether to infer gross disproportionality, a federal court

should examine whether a petitioner's sentence is justified by the gravity of his triggering

offense and his criminal history, a process similar to the three-pronged approach employed by

California state courts.  *See Ramirez v. Castro*, 365 F.3d 755, 768 (9th Cir. 2004).

Within the last several years, the United States Supreme Court has considered a number

of Eighth Amendment cases involving juvenile offenders, that is, defendants who were under the

age of 18 at the time they committed their offenses.  *See, e.g., Miller v. Alabama*, 567 U.S. 460,

476-77 (2012) (holding that it is unconstitutional to sentence a juvenile to life without possibility

of parole in a capital case); *Graham v. Florida*, 560 U.S. 48, 75 (2010) (holding that it is

unconstitutional to sentence juvenile offender to life without possibility of parole in a non-capital

case); *Roper v. Simmons*, 543 U.S. 551, 575 (2005) (holding that death sentence for juveniles

under the age of 18 is unconstitutional).  The Supreme Court's recent jurisprudence regarding

juveniles does not, however, warrant granting Speight relief here because he was not sentenced

to the death penalty or life without parole and thus his sentence, which includes the possibility of

life imprisonment, does not run afoul of existing Supreme Court authority.

Speight nonetheless argues that his sentence is unfair and disproportionate to the offense

in light of his youth and immaturity, and the facts that no weapons were involved in the charged

offenses and he did not personally commit sexual penetration.  Likewise, Speight refers to the

fact that he may have faced a less harsh sentence if his offense had been committed in any other

state, as well as the fact that his aggregate 28-years-to-life sentence is greater than the minimum

25-year-to-life sentence he could have faced had he committed first-degree murder.  But as the

Court of Appeal thoughtfully reasoned:

> It is true that Speight had no criminal record, but the seriousness of the offenses
> he committed outweighs his lack of prior criminal history.  (*People v. Gonzales* (2001)
> 87 Cal. App. 4th 1, 17; *People v. Alvarado*, supra, 87 Cal. App. 4th at pp. 199–201
> [mandatory one strike term of 15 years to life for defendant who was 18 years old at time
> of offense and had no criminal record was not cruel or unusual].)  And although Speight
> was only 17 years old at the time of the offenses, he was older than Myles and there is no
> evidence that Speight was unusually immature for his age.  Speight was not a mere
> passive observer in the events leading to the commission of sexual penetration. Speight

identified the victim's house to Myles as a house "to hit for PSP's." He led Myles to the victim's house. He agreed to "hit" the victim's house with Myles even though he did not know Myles well and did not trust him. Speight took steps to determine that the 14–year–old victim was at home alone and proceeded with the burglary after Myles expressed the intent to "rush" into the house and grab the victim. Soon after gaining entry into the victim's house, Speight grabbed the victim's arm and, according to the victim, placed his arm around her neck, putting her in a headlock. Speight then saw Myles hit the victim hard enough to cause the victim to come out of Speight's arms, yet Speight thought he would simply "go along with it and just get it done." Speight said nothing, walked away from the victim, and proceeded to search the house for things to take. According to the victim, Speight threatened to hurt her sister if the victim did not cooperate. Speight saw Myles assaulting the victim and heard Myles say he planned to rape the victim, but Speight left the victim alone with Myles in the hallway. The victim testified that Speight did nothing to stop Myles from harming her. Speight knew Myles intended to rape the victim but nonetheless helped Myles restrain the victim, and either bound the victim himself or helped Myles bind her. Although Speight told Myles to leave the victim alone, that occurred after defendants bound the victim and after Myles digitally penetrated her.

Speight was an active participant in the planned burglary and his conduct facilitated the commission of sexual penetration by Myles. (*People v. Em*, *supra*, 171 Cal. App. 4th at pp. 966–967, 975–976 [two consecutive 25–year–to–life terms imposed on defendant who was only 15 years old at time of offense was not cruel and/or unusual where defendant actively participated in a robbery by gang members and one of the participants shot and killed the victim]; *People v. Gonzales*, *supra*, 87 Cal. App. 4th at pp. 5–6, 16–19 [sentence of total of 50 years to life for first degree murder wherein a principal personally used a firearm in the commission of the offense imposed against 16–year–old defendants convicted as aider and abettors was not cruel or unusual where the shooter openly carried a gun as defendants, who were gang members, advanced upon the victims after a perceived act of disrespect]; *People v. Ortiz* (1997) 57 Cal. App. 4th 480, 486–487 [sentence of 26 years to life for 14–year–old defendant who participated in an armed robbery and was convicted of first degree murder as an aider and abettor was not cruel or unusual].) We do not agree with Speight's assessment that his only offense was burglary or robbery. The jury convicted Speight of "serious" and "violent" felonies under the three strikes law and Speight was statutorily ineligible for probation. (§§ 667.5, subd. (c), 667.61, subd. (h), 1170.12, 1192.7, subd. (c), 1203.065, subd. (a).)

*Myles*, 2013 WL 4613810, at *21.

It was not unreasonable for the state court to conclude, under the applicable Supreme

Court authority, that neither Speight's attributes and age at the time of the offense rendered

Speight's sentence disproportionate to his crimes. *See, e.g.*, *Ewing v. California*, 538 U.S. 11,

29-30 (2003) (sentence of 25 years to life for grand theft of $1,200 of golf clubs was not cruel and unusual); *Lockyer*, 538 U.S. at 77 (two consecutive sentences of 25 years to life for petty theft was not cruel and unusual).  And because an inference of gross disproportionality has not been raised, it is unnecessary for this court to conduct a proportionality analysis by comparing the imposed sentence "with those imposed for other crimes in California and for the same crime in other states."  *See Taylor v. Lewis*, 460 F.3d 1093, 1098 n.7 (9th Cir. 2006) ("[I]ntrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.").

In light of the deference that must be afforded the Court of Appeal's determination on federal habeas review, Speight cannot demonstrate that his is one of the exceedingly rare cases in which the sentence imposed raises an inference of gross disproportionality when compared to the crime committed.  *Lockyer*, 538 U.S. at 72-73.  Indeed, in light of AEDPA deference, this Court's review is even more limited than the "exceedingly narrow" review undertaken by the Court of Appeal.  Although Speight's sentence is undeniably severe, the Court cannot say that the Court of Appeal's rejection of his cruel and unusual punishment claim was either unreasonable or contrary to federal law.  Speight is therefore not entitled to federal habeas relief on his cruel and unusual punishment claim.

D.    <u>Ineffective Assistance of Counsel</u> (Ground 7)

Finally, Speight claims that trial counsel rendered ineffective assistance in a variety of ways.  Specifically, Speight faults counsel for failing to: a) object to the CALCRIM No. 301 instruction that Speight's testimony required corroboration (based on Ground 1), b) object to and

27

request a proper instruction on the in-concert element of Count 5 (based on Ground 3), c) request relief based on cruel and/or unusual punishment under state and federal standards (based on Ground 6), and request instructions on sexual battery and/or battery as lesser included offenses to sexual penetration.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that appellate counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Speight must show that his trial counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

With respect to his claims that counsel should have objected to and requested a "proper instruction" on the in-concert element of Count 5, because the Court of Appeal found the instruction on the in-concert element proper, Speight fails to show that counsel was deficient in his actions with respect to that instruction, or that Speight was prejudiced as a result.  *See Rupe v. Wood*, 93 F.3d 1434, 1444-45 (9th Cir. 1996) (defense counsel's failure to raise a meritless argument or to take a futile action does not constitute ineffective assistance of counsel).  And because this Court, like the Court of Appeal, has rejected Speight's cruel and unusual punishment claim, Speight cannot show that counsel should have requested relief on that ground. *Id.*  Similarly, because this Court, like the Court of Appeal, finds harmless any error with respect to the CALCRIM No. 301 instruction that Speight's testimony required corroboration, Speight cannot show that he was prejudiced by counsel's failure to object to that instruction.  *See Strickland*, 466 U.S. at 697.  Finally, the Court of Appeal's dismissal of Speight's conviction for sexual penetration on Count IV, *Myles*, 2013 WL 4613810, at *24, moots his claim that counsel was ineffective for failing to request instructions on sexual battery and/or battery as lesser included offenses to that conviction.  Because the Court of Appeal has already granted Speight

29

the relief he sought as to that conviction, "any prejudice that [Speight] might have suffered due to his trial counsel's ineffectiveness has been cured."  *See United States v. Franklin*, 235 F.3d 1165, 1173 (9th Cir. 2000), *overruled on other grounds in United States v. Aguila-Montes de Oca*, 655 F.3d 915 (9th Cir. 2011).  In sum, Speight is not entitled to relief on any argument advanced in support of his ineffective assistance claim.

## V. CONCLUSION AND ORDER

Speight is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court issues a Certificate of Appealability solely with respect to Speight's CALCRIM No. 301 claim (Ground 1) as well as his claim that trial counsel was ineffective for failing to object to that instruction (Ground 7a).  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).

Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit

Court of Appeals.  *See* Fed. R. App. P. 22(b); 9th Cir. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 16, 2021.

      /s/James K. Singleton, Jr.
      JAMES K. SINGLETON, JR.
      Senior United States District Judge

31